**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| TMJ GROUP LLC<br><br>Plaintiff,<br><br>v.<br><br>IMCMV HOLDINGS INC. AND IMCMV MANAGEMENT, LLC<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CAUSE NO. ____________________ |

**TMJ'S ORIGINAL COMPLAINT**

TMJ GROUP LLC ("TMJ") hereby files this Original Complaint against IMCMV Holdings Inc. ("IMC Holdings") and IMCMV Management, LLC ("IMC Management") (collectively, "IMC" or the "Defendants"), and complaining of causes of action against Defendants alleges as follows:

## I. PARTIES

1. Plaintiff TMJ Group LLC is a limited liability company with its principal place of business located at 442 Canal Street, Suite 206, New Orleans, Louisiana 70130.

2. Defendant IMC Holdings is a corporation with its principal place of business located at 7380 Sand Lake Road, Suite 300, Orlando, Florida 32819. IMC Holdings can be served through its registered agent, Murai, Wald, Biondo & Moreno, P.A., whose registered office is located at 1200 Ponce de Leon Boulevard, Coral Gables, Florida 33134.

3. Defendant IMC Management is a limited liability company with its principal place of business located at 7380 Sand Lake Road, Suite 300, Orlando, Florida 32819. IMC Management can be served through its registered agent, Murai, Wald, Biondo & Moreno, P.A.,

whose registered office is located at 1200 Ponce de Leon Boulevard, Coral Gables, Florida 33134.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it alleges a violation of Regulation D and Section 5 of the Securities Act of 1933, and accordingly arises under the laws of the United States. This Court has supplemental jurisdiction over TMJ's remaining state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to and intertwined with TMJ's federal securities claim as to form a part of the same case and controversy.

5. This Court also has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1) because TMJ and Defendants are citizens of different U.S. states and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(a), (a)(1). TMJ is a citizen of Louisiana for purposes of diversity jurisdiction because its members are all citizens of Louisiana. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077, 1079 (5th Cir. 2008) (citizenship of an LLC is determined by the citizenship of all its members). IMC Holdings is a citizen of Florida for purposes of diversity because it is a corporation incorporated under the laws of Florida and has its principal place of business in Florida. *See* 28 U.S.C. § 1332(c)(1). IMC Management is a citizen of Florida for purposes of diversity jurisdiction because its sole member is a citizen of Florida. *See Harvey*, 542 F.3d at 1079.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this lawsuit occurred in this district. A significant number of meetings between TMJ and Defendants concerning TMJ's investment occurred in this district, Defendants made false and inaccurate representations in this district, and TMJ has suffered injury in this district.

## III. BACKGROUND FACTS

### A. Introductory Facts

6. Defendants are in the business of locating investors to invest in development of Jimmy Buffet's Margaritaville restaurants throughout the United States and internationally. Defendants are not new to this business. Upon information and belief, Defendants have developed Margaritaville restaurants in Destin, Panama City, and Key West Florida, and have participated in a joint venture with Universal Studios for the Margaritaville restaurant located in Orlando, Florida.

7. Defendants have also acquired and/or developed Margaritaville restaurants in Myrtle Beach, North Carolina; Nashville and Pidgeon Forge, Tennessee; at the Navy Pier in Chicago, Illinois; Cincinnati, Ohio; Atlantic City, New Jersey; Las Vegas, Nevada; and the Mohegan Sun resort in Connecticut.

8. Upon information and belief, Defendants are in the process of developing or acquiring Margaritaville restaurants in San Antonio, Texas; Syracuse, New York; Virginia Beach, Virginia; and West Palm Beach, Florida.

9. TMJ is a commercial real estate investor that identifies prospective business opportunities and invests capital into those opportunities based on their forecasted profits. In this vein, in or around March 2015, Mario Abal ("Mr. Abal"), Chief Development Officer of IMC Holdings, approached TMJ regarding the prospect of opening a Margaritaville-themed restaurant in the Mall of America in Minneapolis, Minnesota ("the MOA Business") and in the French Quarter in New Orleans, Louisiana (the "NOLA Business"). As Chief Development Officer, Mr. Abal's primary responsibility was finding investors and developing Margaritaville restaurants on behalf of IMC.

10. On or about March 5, 2015, TMJ met with Mr. Abal in New Orleans, Louisiana to discuss details concerning the agreements and financing for both the MOA Business and NOLA Business. During this meeting, TMJ and Mr. Abal discussed TMJ potentially investing in IMC. TMJ received financial documentation concerning the NOLA Business during this meeting, including a pro forma for the NOLA Business. To date, TMJ has invested $553,299.05 to develop the NOLA Business, at the direction of IMC.

11. On or about May 27, 2015, TMJ met with Mr. Abal and Eric McBride, architect/designer for Margaritaville restaurants, in New Orleans to discuss architectural plans and drawings for the NOLA Business. During this time period, TMJ and IMC continued to discuss TMJ's investment in both the NOLA Business and the MOA Business.

12. In determining whether to invest in a particular commercial opportunity, commercial real estate investors like TMJ often rely on, among other documents, financial information provided by the offeror, including pro formas and budgets that convey important information regarding the business, including earnings before interest, taxes, depreciation and amortization ("EBITDA") over set periods of time, as well as net revenue projections. For a company such as IMC Holdings, who is in the business of developing Margaritaville restaurants and had already acquired and/or developed numerous other Margaritaville restaurants, TMJ had a reasonable expectation that the financial information it received from IMC was accurate. Indeed, TMJ understood that IMC called on its experience in developing and operating Margaritaville restaurants in other locations in creating the financial documents that it provided to TMJ, and TMJ justifiably relied on the same.

13. During the time in which Mr. Abal was discussing the MOA Business with TMJ, he stated that the restaurant lease with the owner of the Mall of America for the MOA Business was the "best rent I ever negotiated."

14. On July 28, 2015, Mr. Abal, on behalf of IMC Holdings, sent TMJ a pro forma (the "First Pro Forma") for the MOA Business showing EBITDA in the first twelve months at $448,569. (A true and correct copy of the July 28, 2015 "First Pro Forma" is attached hereto as **Exhibit A**; *see also infra.* Table 1.) It was explained to TMJ that it would receive a majority of the $448,569 in EBITDA.

15. The First Pro Forma also reflects that the first calendar quarter of the MOA Business's operations would yield $1.842 million in net revenue, and a total net revenue of $7.191 million over the first twelve months of operation. (*See id.*) On behalf of Defendants, Mr. Abal and others affiliated with IMC stated that the financial projections for the MOA Business were conservative, and were expected to significantly exceed the projections reflected in the First Pro Forma. At no point in time did Defendants state that the projected financials of the MOA Business would be difficult to obtain or challenging. Neither did IMC state that the projections reflected in the First Pro Forma were a "guesstimate." By contrast, Defendants created the projected financials based on IMC's significant experience developing and operating the Margaritaville restaurants. Further, Defendants stated that the MOA Business would have no difficulty reaching these conservative projections. TMJ had a relationship of confidence in IMC, which reasonably induced TMJ to rely on Defendants' representations concerning the financials of the MOA Business.

16. IMC was fully aware that TMJ intended to obtain financing for its investment from the beginning of IMC's dealings with TMJ. Mr. Abal and others affiliated with IMC stated

that TMJ would have no problems servicing the debt used for the investment because TMJ would receive quarterly interest payments and distributions.

17. Relying on the representations made in the First Pro Forma and the representations of Mr. Abal and others affiliated with IMC, TMJ was induced to execute a series of agreements relating to the MOA Business in August 2015, discussed in further detail immediately below, as well as obtain financing and invest substantial capital into the MOA Business as a passive, non-managerial investor.

## B. The August 2015 Operating and Management Agreements

18. On or about August 18, 2015, TMJ entered into a Limited Liability Company Operating Agreement (the "Operating Agreement") with IMC Holdings under which IMCMV MOA, LLC ("IMC MOA" or the "Company") was formed. (*See* August 2015 "Operating Agreement," a true and correct copy of which is attached hereto as **Exhibit B**, at § 1.1.)

19. Schedule 1 to the Operating Agreement lists IMC Holdings and TMJ as the Company's sole "Members." (*See id.* at Schedule 1.) Additionally, the Operating Agreement provides that IMC Holdings shall be the initial Manager of the Company. (*See id.* at § 4.1.1.)

20. Exhibit C to the Operating Agreement is a Management Agreement[1] that was executed by and between IMC Management and IMC MOA (whose members are TMJ and IMC Holdings). (*See id.* Ex. C.) The Management Agreement recites that IMC Holdings and TMJ formed IMC MOA, a Manager-managed LLC, for the purpose of "developing, owning and operating a Margaritaville- themed restaurant and bar" located in the Mall of America in Minneapolis, Minnesota. (*See id.* Ex. C at ¶¶ A-B.)

[1] The First Pro Forma (Exhibit A to this Original Complaint) is also attached to the Management Agreement as "Exhibit C: Operating Budget 2016."

21. Pursuant to the Management Agreement, IMC Management, acting as Manager, was to "use its prudent professional efforts to manage and operate the [MOA] Business . . . in compliance with the requirements of the Operating Agreement, the Lease, the Sublicense Agreement . . ., any financing agreements of [IMC MOA] and applicable federal, state and local laws . . ." (*See id.* Ex. C at § 1.)

22. Among IMC Management's expressly enumerated duties is "[e]xercis[ing] the rights and duties of the Manager pursuant to the Operating Agreement with respect to financial matters of the Company, including such as relate to capital contributions, determinations of 'Net Cash' (as defined by the Operating Agreement) and distributions, all in compliance with the Operating Agreement." (*Id.* Ex. C at § 2(f)(ii).)

23. Moreover, the Management Agreement provides that "[n]o later than sixty (60) days prior to the end of each calendar year, Manager shall prepare *in good faith* and submit to the Company and the Members for comment and approval, a proposed annual operations budget for the [MOA] Business for the following year setting forth an estimate of the Premises Revenue, Operating Expenses, Capital Expenditures, and a pro forma Income Statement (each an 'Operating Budget')." (*Id.* Ex. C at § 2(i)) (emphasis added) (citing the "Operating Budget for the [MOA] Business's first year," also Ex. A to this Original Complaint ("First Pro Forma")). "The preparation of each such Operating Budget shall be based on the actual results of the prior calendar year, as well as possible occurrences which Manager believes may impact the operation of the [MOA] Business or cause changes from the previous year's results, reasonable predictions for the future and such other information and assumptions as shall be reasonable under the circumstances." (*Id.*)

### C. Financing the MOA Business Investment

24. Shortly after the parties executed the aforementioned agreements, in October 2015, TMJ moved forward with attempting to arrange financing for the investment opportunity with First NBC Bank (the "Bank") in New Orleans, Louisiana.

25. However, after reviewing the operating agreements and financial documents, including the First Pro Forma, and conducting its own analysis, the Bank did not approve financing based on the EBITDA represented in the First Pro Forma and ultimately declined financing TMJ's investment. While Defendants represented that TMJ would receive the majority of the EBITDA of $448,569 in that year, the Bank determined that instead, preferred interest payments (both to TMJ for its initial investment of $3,191,223.50, as well as approximately $700,000 for IMC Holdings' pre-opening expenses) would be paid out of the $448,569. Thus, TMJ would have received only some portion of the $448,569, which would have been split between TMJ and IMC Holdings. Based on the projections in the First Pro Forma, the Bank declined to approve financing for the investment.

26. After learning TMJ was unable to secure financing based on the First Pro Forma, Mr. Abal sent TMJ two revised pro formas in an attempt to urge the Bank to reconsider financing for the investment – one on October 9, 2015 and another on October 12, 2015, both of which increased the projected EBITDA and sales revenues for the MOA Business. (A true and correct copy of the October 9, 2015 "Second Pro Forma" is attached hereto as **Exhibit C**, and a true and correct copy of the October 12, 2015 "Third Pro Forma" is attached hereto as **Exhibit D**; *see also infra.* Table 1.) Moreover, the sales in both the Second Pro Forma and Third Pro Forma are significantly higher than the First Pro Forma, which upon information and belief, were not based on facts, but rather were based on Defendants' incentive to get the Bank to approve the investment.

27. Mr. Abal represented that the increases in sales and corresponding increases in EBITDA as reflected by the Second and Third Pro Formas—despite the fact that no restaurant had been built at this time—were realistic and reasonable because the First Pro Forma's EBITDA was overwhelmingly conservative. Mr. Abal represented that the figures reflected in the Second and Third Pro Formas were still accurate and conservative, albeit not as conservative as the figures contained in the First Pro Forma.

28. The Third Pro Forma revised TMJ's payback to show a guaranteed payback of TMJ's capital investment in approximately five years. Upon information and belief, the Second and Third Pro Formas were revised in order to make the investment look more attractive to the Bank, and to induce the Bank to approve the financing and induce TMJ to continue moving forward with the MOA Business. IMC, and Mr. Abal, were fully aware that the updated financial information provided in the Second Pro Forma and the Third Pro Forma would be provided to the Bank and relied upon by the Bank in its decision whether to fund the investment. At the time, TMJ had no reason to believe that the updated financials and representations contained therein, which were provided by IMC, were inaccurate or false.

29. The EBITDA in the Third Pro Forma was $890,000 for the first year, of which 70% would go towards servicing TMJ's debt. (*See* Ex. D; *see also infra.* Table 1.) Under this calculation, the Bank would have been paid back in full in approximately five years.

30. Reasonably believing IMC's explanation with respect to how it was able to increase its EBITDA, TMJ continued to rely on IMC's representations and, with these new and updated Second and Third Pro Formas, again contacted the Bank regarding the prospect of financing TMJ's investment in IMC.

31. The Bank relied upon IMC's representations in the updated Second and Third Pro Formas in reaching its financing decision. After additional review, the Bank approved the loan based on the information provided by IMC in the Second and Third Pro Formas.

32. Per the Second and Third Pro Formas and IMC's representations, TMJ, the Bank, and TMJ's attorney on the deal were all induced into believing that the MOA Business would exceed $7.191 million in sales over the first twelve months of operation, and that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years. Further, TMJ, the Bank, and TMJ's attorney on the deal were induced into believing that TMJ would have no issues servicing the debt through distributions and interest payments. IMC, through Mr. Abal and others, provided these representations, which were false and inaccurate, with the knowledge that TMJ would rely on these representations in deciding whether to purchase units under the investment agreement. As a potential investor, it is reasonable and justifiable that TMJ would rely on IMC to provide accurate and truthful information concerning the MOA Business, particularly given that IMC has significant experience developing and operating Margaritaville restaurants across the country.

33. Relying on these representations and projections, TMJ moved forward in its dealings with IMC.

34. In connection with the investment opportunity outlined by the agreements TMJ entered into, TMJ infused $3,191,223.50—plus interest and financing charges in the amount of $227,164.92, for a total of $3,418,388.42—into the MOA Business.

35. At no point during the discussions between TMJ and IMC did anyone from IMC indicate that the pro formas provided to TMJ, in which it relied upon for its investment in the MOA Business, were over-stated or inaccurate. Rather, consistent with its earlier

representations, IMC repeatedly stated that the projections provided to TMJ were accurate, and that Defendants had conservatively estimated the revenues, which in fact would be much higher than reflected in the pro formas. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments.

**D. TMJ and IMC Execute Revised Agreements**

36. In order to memorialize the Bank's decision to finance TMJ's investment pursuant to the revised pro formas, in November 2015 IMC Holdings and TMJ entered into an "Amended and Restated" Limited Liability Company Operating Agreement (the "Revised Operating Agreement"). (A true and correct copy of the November 2015 "Revised Operating Agreement" is attached hereto as **Exhibit E**.)

37. Like the original Operating Agreement, Schedule 1 to the Revised Operating Agreement lists IMC Holdings and TMJ as the Company's sole "Members." (*See id.* at Schedule 1.) Also similar to the original Operating Agreement, the Revised Operating Agreement provides that IMC Holdings shall be the initial Manager of the Company. (*See id.* at § 4.1.1.)

38. Exhibit C to the Revised Operating Agreement is an Amended and Restated Management Agreement (the "Revised Management Agreement") that was executed by and between IMC Management and IMC MOA (whose members are TMJ and IMC Holdings) in New Orleans, Louisiana. (*See id.* Ex. C.) Like the original Management Agreement, the Revised Management Agreement recites that IMC Holdings and TMJ formed IMC MOA, a Manager-managed LLC, for the purpose of "developing, owning and operating a Margaritaville-

themed restaurant and bar" located in the Mall of America in Minneapolis, Minnesota. (*See id.* Ex. C at ¶¶ A-B.)

39. Pursuant to the Revised Management Agreement, IMC Management, acting as Manager, was to "use its prudent professional efforts to manage and operate the [MOA] Business . . . in compliance with the requirements of the Operating Agreement, the Lease, the Sublicense Agreement . . ., any financing agreements of [IMC MOA] and applicable federal, state and local laws . . ." (*See id.* Ex. C at § 1.)

40. Among IMC Management's expressly enumerated duties is "[e]xercis[ing] the rights and duties of the Manager pursuant to the [Revised] Operating Agreement with respect to financial matters of the Company, including such as relate to capital contributions, determinations of 'Net Cash' (as defined by the [Revised] Operating Agreement) and distributions, all in compliance with the [Revised] Operating Agreement." (*Id.* Ex. C at § 2(f)(ii).)

41. Moreover, the Revised Management Agreement provides that "[n]o later than sixty (60) days prior to the end of each calendar year, Manager shall prepare *in good faith* and submit to the Company and the Members for comment and approval, a proposed annual operations budget for the [MOA] Business for the following year setting forth an estimate of the Premises Revenue, Operating Expenses, Capital Expenditures, and a pro forma Income Statement (each an 'Operating Budget')." (*Id.* Ex. C at § 2(i)) (emphasis added) (citing the "Operating Budget for the [MOA] Business's first year," also Ex. A to this Original Complaint ("First Pro Forma")). "The preparation of each such Operating Budget shall be based on the actual results of the prior calendar year, as well as possible occurrences which Manager believes may impact the operation of the [MOA] Business or cause changes from the previous year's

results, reasonable predictions for the future and such other information and assumptions as shall be reasonable under the circumstances." (*Id.*)

42. In connection with the execution of the revised agreements, on November 11, 2015, received yet another revised pro forma (the "Fourth Pro Forma") indicating an EBITDA of $639,000 over the first twelve months, down from the $890,000 projected in the Third Pro Forma and provided to the Bank in order to make an underwriting decision. However, the overall net revenue remained substantially similar to the prior pro formas. (A true and correct copy of the November 11, 2015 "Fourth Pro Forma" is attached hereto as **Exhibit F**; *see also infra.* Table 1.) TMJ justifiably relied upon the Fourth Pro Forma in making its decision to execute the revised agreement and maintain its investment in the MOA Business.

43. At no point in time did IMC indicate that the financial information it provided was false and inaccurate. Rather, IMC fraudulently concealed the true financial state by providing false representations and inaccurate statements concerning the financial outlook of the MOA Business.

**E. The MOA Business Opens and Underperforms**

44. From November 2015 to September 2016, construction, design and build-out of the 10,000 square foot Margaritaville restaurant at Mall of America progressed. TMJ invested $3.2 million into the construction and build-out of the restaurant, including furniture, fixtures and equipment ("FFE"), construction labor and materials, and finish-out. IMC dictated the amount of money that was to be spent, and how it was to be spent. IMC approved every check that was written.

45. The night before the restaurant opened, on or about September 19, 2016, TMJ met with David Crabtree ("Mr. Crabtree"), the CEO of IMC Holdings, at the Margaritaville MOA in which Mr. Crabtree made a verbal guarantee that the MOA Business would generate at least $6

million in revenue annually. TMJ relied on this information, and believed it was truthful and accurate at the time. Again, at no point in time did IMC indicate that the financial information it provided was false and inaccurate. Rather, Mr. Crabtree and others at IMC fraudulently concealed the true financial state by providing false representations and inaccurate statements concerning the financial outlook of the MOA Business.

46. The MOA Margaritaville restaurant opened its doors on September 20, 2016. Almost immediately, sales were completely off the represented projections made by IMC Holdings to TMJ. In fact, the actual net revenue from the Company's operations from commencement of the MOA Business's operations is one-third less than the amount of net revenue specified for the first quarter in the First Pro Forma, the pro forma TMJ initially relied on in deciding whether to invest in the MOA Business, and also the subsequent pro formas that were relied upon in executing the revised agreement.

47. After the MOA Margaritaville restaurant opened, on or about October 4, 2016, TMJ met with Mr. Crabtree in New Orleans to discuss the opening of the MOA Business and future plans for the NOLA Business. At no point during this meeting did Mr. Crabtree state that the pro formas provided to TMJ, in which it relied upon for its investment in the MOA Business, were over-stated or inaccurate. Again, Mr. Crabtree reiterated that the projections provided to TMJ were accurate, and Defendants conservatively estimated the revenues, which in fact IMC expected to be much higher than reflected in the pro formas.

48. TMJ questioned IMC about the performance of the MOA Business, and repeatedly reached out to IMC to discuss the performance of the MOA Business. TMJ repeatedly requested financial documentation for the MOA Business, including the daily sales reports, and asked IMC to put together a plan to turn the MOA Business around.

49. After ignoring TMJ's calls and requests for financials for several months, IMC Holdings thereafter sent three additional updated projections in January 2017, each of which contained three different sets of numbers after the restaurant opened that slashed the payback to TMJ significantly. For example, a January 26, 2017 pro forma (the "Fifth Pro Forma") shows an all-time low EBITDA of $195,880 for 2017 and reduced net revenue, which slashed sales and decreased TMJ's payback by almost 69%. (A true and correct copy of the January 26, 2017 "Fifth Pro Forma" is attached hereto as **Exhibit G**; *see also infra.* Table 1.) It was not until TMJ received these revised pro formas on January 26, 2017 that TMJ suspected that the prior financial information and pro formas were false, inaccurate, and fraudulent.

50. Notably, each of these pro formas have conveyed a different EBITDA and different net revenues. However, it was only after TMJ spent over $3.2 million dollars and the MOA Margaritaville restaurant opened that IMC provided the Fifth Pro Forma that slashed EBITDA and net revenue to an amount that renders the venture completely underwater. Consequently, the Company's EBITDA reflects considerable losses since the MOA Business opened in September 2016.

51. As a result of the intentional overstatement of the MOA Business's net revenues by IMC Holdings, net income for the MOA Business's first calendar quarter of operations (October to December of 2016) reflects a net income loss of approximately $81,000. Thus, it was not until TMJ became aware of the actual numbers for the first quarter of operations that it learned the extent of the false and inaccurate information it had received from IMC to induce TMJ to purchase the investment in the MOA Business.

52. As a result of Defendants' continued misrepresentations of fact and fraudulent inducement of TMJ into the MOA Business and to remain in the MOA Business, TMJ has

sustained considerable damages and thereby brings the causes of action specified below against Defendants.

**Table 1: Quarterly/Annual Projected EBITDA and Revenues**

| **Pro Forma** | **Date** | **Projected EBITDA** | **Actual EBITDA** | **Projected Revenue (millions)** | **Actual Revenue (millions)** | **Comments** |
|---|---|---|---|---|---|---|
| First | 7/28/15 | $129,000 (Q1) / $449,000 (Y1) | -[2] | $1.84 (Q1) / $7.19 (Y1) | - | Bank declines financing |
| Second | 10/9/15 | $527,000 (Y1) | - | $7.2 (Y1) | - | Second and Third Pro Formas contain no quarterly information |
| Third | 10/12/15 | $890,000 (Y1) | - | $8.0 (Y1) | - | Bank extends financing |
| Fourth | 11/11/15 | $177,000 (Q1) / $639,000 (Y1) | - | $1.84 (Q1) / $7.19 (Y1) | - | |
| Fifth | 1/26/17 | -$29,968 (Q1) / $195,880 (Y1) | $42,507 (Q1) (almost $80,000, or 100.86%, lower than the First Pro Forma's projected EBITDA) | $0.82 (Q1) / $4.2 (Y1) | $0.92 (Q1) (almost $1M, or 66.67%, lower than the First Pro Forma's projected revenue) | The restaurant opens 9/16 |

[2] Actual EBITDA and Actual Revenue for the First through Fourth Pro Formas is blank because the restaurant did not open until September 2016.

**F. IMC Withholds MOA Business Financials**

53. In addition to the MOA Business's underperformance, IMC has also deliberately withheld financials from TMJ, which are necessary for TMJ's evaluation of the MOA Business and its commercial viability. For example, prior to opening the restaurant, Mr. Abal represented on numerous occasions that TMJ would receive daily sales reports, monthly profit and loss statements ("P&Ls"), and year-end P&Ls. Ultimately, since and before the MOA Business opened, TMJ has been told repeatedly that it would be receiving financials.

54. TMJ repeatedly requested financial documentation for the MOA Business, including the daily sales reports, and asked IMC to put together a plan to turn the MOA Business around. TMJ's calls and requests for financials for several months were ignored by IMC Holdings.

55. From at least December 2016 through March 2017, TMJ held conversations with Mr. Abal in which Mr. Abal was allegedly "shocked" that TMJ had not yet received necessary financials relating to the MOA Business.

56. Despite failing to provide the financials, IMC continued to deliver assurances regarding delivery of financials to TMJ and the outlook of the business in order to persuade TMJ to maintain its investment in the MOA Business.

57. After the restaurant had been in operation for a few months, on or about January 24, 2017, Mr. Crabtree and Renato Barbon, IMC Holdings' CFO, made affirmations similar to those Mr. Abal had made on prior occasions regarding sending TMJ daily sales, monthly P&Ls, and year-end P&Ls during a telephone call in which TMJ participated in New Orleans, Louisiana. Even despite Mr. Crabtree and Mr. Barbon's assurances that TMJ would receive the financial information, TMJ did not receive the requested financial information.

58. TMJ has made frequent requests to receive this information, including as recently as March 30, 2017 when TMJ made the request through its counsel. Until very recently, TMJ had only received monthly P&Ls and the 2016 P&L. Finally, as a result of discussions between counsel, TMJ received the monthly sales volumes on April 12, 2017.

59. As a result of Defendants' withholding of important financial information, TMJ has been unable to fully evaluate the MOA Business, nor engage in meaningful communications regarding its commercial trajectory.

## IV. CAUSES OF ACTION

### COUNT I:
### DECLARATORY JUDGMENT FOR RESCISSION OF THE AGREEMENTS PURSUANT TO REGULATION D AND SECTION 5 OF THE SECURITIES ACT OF 1933

60. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-59 above by reference.

61. Under both Louisiana and Florida law, a "security" is defined as, among other things, "participation in any profit-sharing agreement" and an "investment contract." LA. REV. STAT. § 51:702(15)(a); F.S.A. § 517.021(22).

62. An "investment contract" is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or third party."

63. A membership unit in an LLC is considered an "investment contract" and thus falls under the definition of a security.

64. TMJ invested money in the Company with an expectation of profits to be derived solely from the efforts of IMC. Under the Operating Agreement, "Manager" means the person designated by the Members to manage the Company, and IMC Management is expressly designated as the Manager. (Ex. B at § 1.9, p. 3.) "Member" means any person who holds Class

B Units (which evidence membership interests in the Company, *see id.* at § 2.4) and is admitted as a Member of the Company. (*Id.*) The "initial Members" of the Company are IMC Holdings and TMJ. (*Id.* at § 2.1.)

65. In other words, the Company's business structure is such that IMC Management, the Manager, exercises control and management over the MOA Business, while TMJ is wholly a passive and non-managerial investor. Accordingly, TMJ's LLC membership interest is an "investment contract" and thus a security.

66. The fact that IMC Management failed to comply with applicable securities laws in soliciting TMJ's investment in the Company constitutes a violation of Regulation D and Section 5 of the Securities Act of 1933 (the "Act"). Upon information and belief, IMC Management failed to properly register the securities investment in the MOA Business pursuant to Regulation D and Section 5 of the Act.

67. Violations of the registration provisions of Section 5 of the Act and Regulation D give the purchaser (TMJ) the right to rescind the transaction, pursuant to Sections 12(a)(1) and 13 of the Act, as against any seller (IMC) of the securities who has violated Section 5.

68. TMJ requested rescission of its investment in writing by sending a demand letter to Defendants on March 22, 2017. To date, Defendants have refused to comply with TMJ's rescission request.

69. Accordingly, pursuant to federal securities law, TMJ hereby demands rescission of its investment in the MOA Business and requests recovery of the purchase price for the security, plus interest, less any distributions on the security, totaling $3,418,388.42.

70. In addition, TMJ invested $553,299.05 to develop the NOLA Business, which upon information and belief, also was not properly registered by Defendants. Accordingly, TMJ seeks rescission of its $553,299.05 securities investments.

## COUNT 2:
## INTENTIONAL MISREPRESENTATION / FRAUDULENT INDUCEMENT

71. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-70 above by reference.

72. Specifically, Mr. Abal and others at IMC Holdings and IMC Management met with TMJ and communicated with TMJ on multiple occasions in order to persuade TMJ to invest with Defendants as detailed above. In order to persuade TMJ to invest, Mr. Abal and others provided specific revenue projections in the pro formas with the knowledge and intent that TMJ would rely on the financial performance projections provided by Defendants.

73. Defendants have made representations of material fact and suppressed the truth with respect to the MOA Business's commercial performance by way of verbal affirmations, intentional withholding of financials, and artificially and deliberately inflated pro formas. For example, after providing financial projections vis-à-vis the First Pro Forma, Mr. Abal and others affiliated with IMC stated that the financial projections for the MOA Business were conservative, and were expected to significantly exceed the projections reflected in the First Pro Forma. Similarly, after providing the Second and Third Pro Formas, Mr. Abal and others affiliated with IMC stated that the financial projections for the MOA Business were conservative, and were expected to significantly exceed the projections reflected in the Second and Third Pro Formas. At no point in time did Defendants state that the MOA Business would be difficult to obtain or challenging – rather, Defendants stated that the MOA Business would have no difficulty reaching these conservative projections.

74. Moreover, Defendants were fully aware that TMJ intended to secure financing for its potential investment. When the financing through the Bank fell through and the Bank did not approve the financing based on the financial projections provided, Defendants altered the financial projections to reach a level that would be approved by the Bank, including a guaranteed return. TMJ justifiably relied on the updated financial projections provided to it and the Bank in reaching the decision to move forward with the investment with Defendants. TMJ has suffered damages as result of Defendants fraudulent statements and suppression of the truth in amount to be determined.

75. Specifically, when the Bank rejected financing in October 2015, Mr. Abal sent TMJ the Second Pro Forma and Third Pro Forma, each of which revised upward the revenue and EBITDA projections compared to the First Pro Forma. Moreover, the Third Pro Forma showed a guaranteed payback of TMJ's capital investment in approximately five years and increased sales in both pro formas based on no change in substantive data from the First Pro Forma. Defendants made such representations with the intent to deceive TMJ and induce TMJ to invest significant capital into the MOA Business. Defendants further made such representations with the intent to deceive the Bank and to induce it to approve the funding for the MOA Business.

76. TMJ justifiably relied on Defendants' pro formas and verbal affirmations with respect to the MOA Business's viability, which ultimately resulted in injury to TMJ. Further, TMJ had a relationship of confidence in IMC, which reasonably induced TMJ to rely on Defendants' representations. TMJ continues to sustain injury as the MOA Business continues to underperform, in contravention of Defendants' pro forma projections and affirmations with respect to the MOA Business's commercial viability.

77. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

78. TMJ seeks damages in an amount to be determined, including punitive damages, in connection with Defendants' fraudulent inducement and intentional misrepresentations.

79. Despite due diligence in reviewing the financial information provided by IMC prior to its investment, TMJ could not have discovered IMC's intentional misrepresentations and fraudulent inducement until it discovered the extent of the falsities in the financial information in January 2017 when it received updated pro formas reflecting the actual operations from 4th Quarter 2016 and when it received the daily sales reports in April 2017. TMJ reasonably relied upon IMC's expertise and experience in developing the financial information given that is in the business of operating and managing Margaritaville restaurants. Once TMJ became aware of the extent of the falsity in the financial information, it immediately sought further information from IMC, drafted a demand letter to IMC, and filed the instant lawsuit.

80. Further, TMJ could not have discovered IMC's intentional misrepresentations and fraudulent inducement because rather than tell TMJ that the financial projections were inaccurate and false, IMC fraudulently concealed the truth regarding the MOA Business' financials. Moreover, IMC refused to provide TMJ with accurate financial information so that TMJ could conduct its own analysis regarding the viability of the MOA Business.

81. Due to IMC's intentional misrepresentations and fraudulent inducements, TMJ seeks rescission of the agreements, which Defendants fraudulently induced TMJ to enter into and provide investment funds. Accordingly, the agreements are null and void, and should be rescinded.

## COUNT 3:
## BREACH OF CONTRACT

82. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-81 above by reference.

83. The Revised Operating Agreement and Revised Management Agreement are each valid and binding contracts, the former of which was entered into by and between TMJ and IMC Holdings (to form IMC MOA), and the latter of which was entered into by and between IMC MOA (a member of which is TMJ) and IMC Management.

84. The Revised Management Agreement provides that the MOA Business's Manager (IMC Management) shall "exercise the rights and perform the duties and obligations of the Manager of the Company pursuant to the Operating Agreement and this Management Agreement," including "us[ing] its prudent professional efforts to manage and operate the [MOA] Business . . . in compliance with the requirements of the Operating Agreement, the Lease, the Sublicense Agreement . . ., any financing agreements of the Company and applicable federal, state and local laws, ordinances, rules and regulations . . ." (Ex. E its Ex. C at § 1.)

85. Among IMC Management's expressly enumerated duties is "[e]xercis[ing] the rights and duties of the Manager pursuant to the [Revised] Operating Agreement with respect to financial matters of the Company, including such as relate to capital contributions, determinations of 'Net Cash' (as defined by the [Revised] Operating Agreement) and

distributions, all in compliance with the [Revised] Operating Agreement." (*Id.* its Ex. C at § 2(f)(ii).)

86. Moreover, the Revised Management Agreement provides that "[n]o later than sixty (60) days prior to the end of each calendar year, Manager shall prepare *in good faith* and submit to the Company and the Members for comment and approval, a proposed annual operations budget for the [MOA] Business for the following year setting forth an estimate of the Premises Revenue, Operating Expenses, Capital Expenditures, and a pro forma Income Statement (each an 'Operating Budget')." (*Id.* its Ex. C at § 2(i)) (emphasis added) (citing the "Operating Budget for the [MOA] Business's first year," also Ex. A to this Original Complaint ("First Pro Forma")). "The preparation of each such Operating Budget shall be based on the actual results of the prior calendar year, as well as possible occurrences which Manager believes may impact the operation of the [MOA] Business or cause changes from the previous year's results, reasonable predictions for the future and such other information and assumptions as shall be reasonable under the circumstances." (*Id.*)

87. TMJ performed under the agreements by duly investing required capital into the MOA Business. However, Defendants breached the agreements by, among other things, (i) preparing substantially inaccurate pro formas in bad faith; (ii) preparing operating budgets not based on actual results of the prior calendar year, but rather on Defendants' own self-gain; (iii) deliberately determining an inaccurate and artificially inflated net revenue; (iv) routinely and intentionally withholding financials from TMJ; and (v) providing inflated pro formas to TMJ, which were also provided to the Bank in order to induce it to approve TMJ's investment in the MOA Business.

88. Defendants' breach (failure to perform) resulted in damages to TMJ, in an amount to be determined, but exceeding $75,000. Additionally, TMJ continues to sustain injury as the MOA Business continues to underperform, in contravention of Defendants' pro forma projections and affirmations with respect to the MOA Business's commercial viability. TMJ further continues to sustain injury because it cannot invest in other opportunities.

89. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

90. In addition to damages, TMJ seeks rescission of the agreements, which Defendants fraudulently induced TMJ to enter into and provide investment funds. Accordingly, the agreements are null and void, and should be rescinded.

## COUNT 4:
## BREACH OF FIDUCIARY DUTY

91. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 91 above by reference.

92. Defendants and TMJ, as co-Members of IMC MOA, are fiduciaries and accordingly owe each other absolute fiduciary duties. Defendants knowingly colluded and/or participated in the breach of fiduciary duty by virtue of their fraudulent inducement of TMJ into the MOA Business based on knowingly inflated pro formas designed to provide requisite assurance to the Bank in order to secure financing. Defendants' breach of their fiduciary duties

resulted in damages to TMJ, in an amount to be determined, but exceeding $75,000. Additionally, TMJ continues to sustain injury as the MOA Business continues to underperform, in contravention of Defendants' pro forma projections and affirmations with respect to the MOA Business's commercial viability.

93. Moreover, Defendants were fully aware that TMJ intended to secure financing for its potential investment. When the financing through the Bank fell through and the Bank did not approve the financing based on the financial projections provided, Defendants altered the financial projections to reach a level that would be approved by the Bank, including a guaranteed return in breach of their fiduciary duty to TMJ. TMJ has suffered damages as result of Defendants breach of fiduciary duty in amount to be determined.

94. IMC breached its fiduciary duty by artificially increasing sales projections and EBITDA from the First Pro Forma in order to gain funding approval by the Bank, and further by representing that such increases were reasonable and realistic in light of earlier "overly-conservative" figures. After TMJ secured funding from the Bank, IMC reverted back to the First Pro Forma's figures – figures that had been rejected by the Bank in TMJ's first attempt to obtain financing.

95. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

96. Despite due diligence in reviewing the financial information provided by IMC prior to its investment, TMJ could not have discovered IMC's breach of fiduciary duty until it discovered the extent of the falsities in the financial information in January 2017 when it received updated pro formas reflecting the actual operations from 4th Quarter 2016 and it received the daily sales reports in April 2017. TMJ reasonably relied upon IMC's expertise and experience in developing the financial information given that is in the business of operating and managing Margaritaville restaurants, and relied upon IMC to uphold its fiduciary duty. Once TMJ became aware of the extent of the falsity in the financial information, it immediately sought further information from IMC, drafted a demand letter to IMC, and filed the instant lawsuit.

97. Further, TMJ could not have discovered IMC's intentional misrepresentations and fraudulent inducement because rather than tell TMJ that the financial projections were inaccurate and false, IMC fraudulently concealed the truth regarding the MOA Business' financials. Moreover, IMC refused to provide TMJ with accurate financial information so that TMJ could conduct its own analysis regarding the viability of the MOA Business.

## COUNT 5:
## NEGLIGENT MISREPRESENTATION

98. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-97 above by reference.

99. The elements of a negligent misrepresentation claim are: (1) false information supplied by the defendants; (2) the defendants must have had a duty to supply correct information; (3) the duty to supply correct information must have been breached by an act or omission of the defendants; and (4) the plaintiffs must have incurred damages as a result of the plaintiffs' reliance on the false information.

100. As demonstrated above, Defendants provided false and misleading information to TMJ, including materially false and inaccurate pro formas, incorrect commercial projections, and inaccurate figures for the MOA Business's net revenue. IMC Holdings and IMC Management each had a duty to supply correct information in their roles as co-Members and Manager of the Company. Defendants breached their duty to supply correct information by their affirmative misrepresentations of fact, both in the way of verbal assurances and written guarantees in the pro formas and otherwise. Defendants' breach of their duties to supply correct information resulted in damages to TMJ, in an amount to be determined, but exceeding $75,000. TMJ continues to sustain injury as the MOA Business continues to underperform, in contravention of Defendants' pro forma projections and affirmations with respect to the MOA Business's commercial viability.

101. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

102. Despite due diligence in reviewing the financial information provided by IMC prior to its investment, TMJ could not have discovered IMC's negligent misrepresentations until it discovered the extent of the falsities in the financial information in January 2017 when it received updated pro formas reflecting the actual operations from 4th Quarter 2016 and it received the daily sales reports in April 2017. TMJ reasonably relied upon IMC's expertise and

experience in developing the financial information given that is in the business of operating and managing Margaritaville restaurants, and relied upon IMC to provide accurate financial information concerning the MOA Business. Once TMJ became aware of the extent of the falsity in the financial information, it immediately sought further information from IMC, drafted a demand letter to IMC, and filed the instant lawsuit.

103. Further, TMJ could not have discovered IMC's intentional misrepresentations and fraudulent inducement because rather than tell TMJ that the financial projections were inaccurate and false, IMC fraudulently concealed the truth regarding the MOA Business' financials. Moreover, IMC refused to provide TMJ with accurate financial information so that TMJ could conduct its own analysis regarding the viability of the MOA Business.

## COUNT 6:
## LOUISIANA BLUE SKY LAWS

104. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-103 above by reference.

105. As demonstrated above, Defendants provided false and misleading information to TMJ, including materially false and inaccurate pro formas, incorrect commercial projections, and inaccurate figures for the MOA Business's net revenue. TMJ did not know of the false and misleading information at the time that Defendants provided the false and misleading information to Defendants.

106. Defendants knew of the falsity of the information they provided to TMJ, or in the exercise of due diligence, could have discovered the falsity of the information they provided to TMJ.

107. As a result of Defendants providing false and misleading information, TMJ has suffered loss and damages, in an amount to be determined, but exceeding $75,000. TMJ

continues to sustain injury as the MOA Business continues to underperform, in contravention of Defendants' pro forma projections and affirmations with respect to the MOA Business's commercial viability.

108. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

109. Further, IMC Management failed to comply with applicable Louisiana Blue Sky Laws in soliciting TMJ's investment in the Company in violation of Louisiana Revised Annotated Statute §51:705. Upon information and belief, IMC Management failed to properly register the securities investment in the MOA Business pursuant to Louisiana Revised Annotated Statute §51:705. Violations of the registration provisions of Louisiana Revised Annotated Statute §51:705 give the purchaser (TMJ) the right to rescind the transaction, pursuant to Louisiana Revised Annotated Statute §§ 51:712(A)(1); 51:712(A)(3); and 51:714(A), as against any seller (IMC) of the securities who has violated the Louisiana Blue Sky Laws.

110. TMJ requested rescission of its investment in writing by sending a demand letter to Defendants on March 22, 2017. To date, Defendants have refused to comply with TMJ's rescission request.

111. Accordingly, pursuant to Louisiana Blue Sky Laws, Revised Statute Annotated § 51.714(A), TMJ hereby demands rescission of its investment in the MOA Business and requests

recovery of the purchase price for the security, plus attorneys' fees, court costs and interest, less any distributions on the security, totaling $3,418,388.42.

112. In addition, TMJ invested $553,299.05 to develop the NOLA Business, which upon information and belief, also was not properly registered by Defendants. Accordingly, TMJ seeks rescission of its $553,299.05 securities investments.

## COUNT 7:
## LOUISIANA UNFAIR TRADE PRACTICES ACT

113. TMJ hereby incorporates for all purposes the allegations set forth in paragraphs 1-112 above by reference.

114. Louisiana law prohibits unfair trade practices, including, without limitation, "unfair or receptive acts or practices in the conduct of any trade or commerce." LA. REV. STAT. § 51:1405.

115. Any person who suffers any ascertainable loss of money or movable property as a result of the use or employment by another person of an unfair act or practice declared unlawful by Section 51:1405 may bring an action to recover actual damages, including reasonable attorneys' fees and costs. LA. REV. STAT. § 51:1409.

116. Defendants' actions in providing false and misleading information to TMJ constitutes unfair and/or deceptive acts or practices in the conduct of trade or commerce. Accordingly, TMJ is entitled to actual damages, reasonable attorneys' fees and costs, and all other damages as may be necessary to compensate TMJ.

117. Further, IMC repeatedly stated that TMJ would receive distributions and interest payments sufficient to pay the Bank debt off in approximately five years and that TMJ would have no issues servicing the debt on the project through distributions and interest payments. In reality, aside from one $13,000 disbursement TMJ received in January 2017, TMJ has not

received distributions and interest payments sufficient to pay the monthly Bank debt. As a result, TMJ's losses increase monthly as it continues to come out of pocket to pay the Bank debt on a monthly basis.

**COUNT 8:**
**ATTORNEYS' FEES**

118. As a result of IMC's actions and inactions, TMJ has been forced to retain the undersigned attorneys to represent it in this lawsuit. Accordingly, TMJ is entitled to recover its reasonable and necessary attorneys' fees from IMC pursuant to both the Revised Operating Agreement and Revised Management Agreement. (*See* Ex. E at § 10.4 ("Attorney Fees"); *see also id.* its Ex. C at ¶ 14 ("Enforcement Costs").)

119. Moreover, IMC is entitled to recover attorneys' fees pursuant to Louisiana Civil Code, Article 1958.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, TMJ respectfully prays that the Court grant it relief, with respect to the MOA Business, in the amount of $3,418,388.42 pursuant to its right to rescind the agreements under Regulation D, or damages to be determined at the time of trial, the extent to which TMJ has been presently injured, plus any additional damages as the MOA Business continues to underperform, punitive damages, and attorneys' fees. With respect to the NOLA Business, TMJ respectfully requests that the Court grant it relief in the amount of $553,299.05 pursuant to its right to rescind the agreements under Regulation D, or damages to be determined at the time of trial, the extent to which TMJ has been presently injured, plus any additional damages, plus attorneys' fees. TMJ further prays for all further and additional relief, in law and in equity, to which it may be justly entitled.

Respectfully submitted,

/s/

**Omer F. Kuebel, III**
State Bar No. 21682
rkuebel@lockelord.com
**Robert W. Mouton**
State Bar No. 19717
rmouton@lockelord.com
**Kelly R. Vickers (*pro hac vice* pending)**
State Bar No. 24041827
kvickers@lockelord.com
**Matthew B. Buongiorno (*pro hac vice* pending)**
State Bar No. 24097436
matthew.buongiorno@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000 (phone)
(214) 740-8800 (fax)

ATTORNEYS FOR TMJ GROUP LLC